**DIAMOND COAL CO. v. COMPAGNE NAVIGAZIONE SOTA Y AZNAR et al.**

(Circuit Court of Appeals, Fourth Circuit.   January 8, 1924.)

No. 2126.

Exchanges ◎⎯14⎯Evidence held not to sustain claim to fund on the ground of mistake.

   Evidence *held* not to sustain claim that cars of coal received by a coal exchange and credited to respondent, and impounded and sold as its property, were so received and credited through mistake, and were in fact the property of one selling coal to the respondent, but claiming that the particular cars were consigned to the exchange for its own account.

Appeal from the District Court of the United States for the District of Maryland, at Baltimore; John C. Rose, Judge.

Suits in admiralty by the Compagne Navigazione Sota y Aznar and by the Canute Steamship Company, Limited, against the Diamond Fuel Company. On intervening petition of the Diamond Coal Company, opposed by the libelants and others. Petition dismissed, and intervener appeals. Affirmed.

For opinion below, see 288 Fed. 564.

J. M. Ritz and William C. Howard, both of Wheeling, W. Va. (John A. Howard, of Wheeling, W. Va., on the brief), for appellant.

Charles R. Hickox, of New York City (Stuart S. Janney, of Baltimore, Md., Clement C. Rinehart, of New York City, and R. E. Lee Marshall and W. Ainsworth Parker, both of Baltimore, Md., on the brief), for appellees.

Before WOODS and WADDILL, Circuit Judges, and SOPER, District Judge.

SOPER, District Judge. The controversy in this case concerns the ownership of 40 cars of coal shipped from the mines at Adrian and Ella, W. Va., to the Tidewater Coal Exchange, Incorporated, at Baltimore. This organization, which is hereinafter called "Tidewater Exchange" is an association of business concerns engaged in the export of coal. Members of the Exchange have the privilege of shipping coal in its care, and, when received, the coal is mingled with other consignments and loses its identity, and a credit to the particular member is made upon the books of the Exchange. When the coal is loaded upon ships for export, an appropriate debit is made against the member.

The 40 cars of coal in question were all received by the Tidewater Exchange in Baltimore during the first 10 days of November, 1920, with the exception of 2 cars, which were received on November 23 and November 25, 1920. They were credited by the Tidewater Exchange to the Diamond *Fuel* Company. This corporation had its main office in New York City and a branch office in Fairmont, W. Va., and was engaged in buying and selling coal. In the same West Virginia town, the Diamond *Coal* Company, which was engaged in the same line of business, also had an office. The claim in the case is that the Tidewater Exchange should have credited the 40 cars of coal to the Dia-

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

mond Coal Company, hereinafter called the "Coal Company," instead of to the Diamond Fuel Company, hereinafter called the "Fuel Company."

In the nature of things, some confusion of the two corporations in the trade was likely to ensue, and to manifest itself in the records of the mines, or of the railroad transporting the coal, or of the Tidewater Exchange at Baltimore, which received coal from both the Fuel and the Coal Company. The Fuel Company was a member of the Exchange, and had the right to ship coal to it in its own name. The Coal Company was not a member, and did not have this privilege, but it did ship coal to the Exchange for the account of other parties. The controversy in this case was caused by this very confusion, as the circumstances will show.

The affairs of the Fuel Company were brought into the District Court of the United States for the District of Maryland by libels in personam in admiralty, filed against it by certain steamship companies, in which suits foreign attachments were issued and served upon the Tidewater Exchange on October 28, 1920, the effect of which was to attach all the credits of the Fuel Company in the hands of the Tidewater Exchange. At that time, some of the coal in suit had not yet been disposed of; indeed, some of it had not yet reached Baltimore; but by consent of the parties a trustee was appointed by the court, who disposed of the coal, and, pending the litigation, held the credits to which the Fuel Company was entitled. The present case grows out of an intervening petition of the Coal Company, filed January 12, 1921, alleging that 42 cars of coal were included in the coal credited by the Tidewater Exchange to the Fuel Company, and that said cars in fact belonged to and should have been credited to the Coal Company. The petitioner claimed that the proceeds from the sale of said cars, in the hands of the trustee, were not properly subject to an attachment by the steamship companies, but that the court should direct the trustee to pay over the proceeds to the Coal Company.

The Coal Company sought to prove the allegations on its behalf through Howard W. Showalter, its president, and through certain of its records produced at the trial. It appears from his testimony that he was president, not only of the Coal Company, but also of the Westwood Coal Exchange, Incorporated, hereinafter called the "Westwood Exchange," which is an affiliated company, subject to the some control as the Coal Company. In fact, the Coal Company and the Westwood Exchange were substantially the same body. Showalter testified that, prior to the shipment of the 42 cars in question, the Coal Company had sold a number of cars to the Fuel Company, to be paid for upon receipt of the weights of the cars. The cars were sent from the mines to Keyser, W. Va., where they were weighed; the weights being furnished by the Railroad company a day or two after the cars had passed the scales. The Fuel Company, however, did not abide by its agreement to pay for the coal on receipt of the weights.

When Showalter first testified in the case on January 13, 1921, he stated that the coal had been sold to the Fuel Company by the Coal Company. In a later deposition, that was taken on May 26, 1922, he testified that in fact the real owner of the coal was the Westwood Ex-

change; but this circumstance is unimportant because of the identity of the two companies. Arrangements for the sale of the coal to the Fuel Company were made by telephone by Showalter's nephew, Brock Showalter, on behalf of the Westwood Exchange.

After the failure of the Fuel Company to pay for the prior shipments, as agreed, Showalter discovered on or about October 28, 1920, that his nephew had directed the shipment of 42 additional cars, as in the case of the prior cars, to the Tidewater Exchange at Baltimore, for the account of the Fuel Company. There was no binding contract to ship these cars, but merely a direction of the Fuel Company to continue shipments until notice to stop. Since the Westwood Exchange had not been paid for prior shipments, Howard Showalter communicated with the shippers of the coal, before the cars left the mines, and directed that the consignment of the 42 cars be changed from the Tidewater Exchange, for the account of the Fuel Company, to the Tidewater Exchange, for the account of the Coal Company. This happened a very short time after Brock Showalter had notified the Fuel Company of the shipments. At the same time Howard Showalter noted in lead pencil upon the records of the Westwood Exchange the changes in the consignment of coal.

A few days thereafter, and before the 42 cars of coal had reached Baltimore, Howard Showalter went to the New York office of the Fuel Company, for the purpose of collecting, not only for the coal already shipped to and received by the Fuel Company, but also for the 42 cars of coal then on their way to Baltimore. He was unable to see any of the officers of the Fuel Company in New York, and believed that he was evaded by them.

At this period, under the orders of the Railroad Administration, no coal could be shipped without a permit, issued by the railroad company, which, could only be obtained if the prospective shipper had a vessel at the port of export into which the coal might be loaded. The Coal Company had no permit for the 42 cars in question, and no vessels to receive the coal. It had made the prior shipment of coal to the Fuel Company upon the latter's permit. Without its authority it shipped the additional 42 cars upon the same permit in the hope that before they arrived in Baltimore they would be paid for by the Fuel Company and accepted by it. Since the Coal Company was not a member of the Tidewater Exchange in Baltimore, Showalter knew that he did not have the privilege to ship the coal to it for the Coal Company's account, but he expected that, in case he had not made satisfactory arrangements for payment with the Fuel Company before the arrival of the coal, it would be rejected by the Tidewater Exchange, and that then the Coal Company would make an effort to sell it to some other person in Baltimore, where there was, at that time, a ready market for coal.

Showalter claimed that he received no confirmations from the Fuel Company of the purchase of the 42 cars, but he did not notify the Fuel Company of the change in consignment, leaving that Company under the impression that the cars would be sent to the Tidewater Exchange. Accordingly the Fuel Company notified the Exchange to expect the cars. They arrived in due time and the railroad company sent arrival

notices to the Exchange that the cars had arrived for the account of the Fuel Company. The Exchange accepted the cars and credited them to the Fuel Company. Showalter testified that he notified the Exchange as soon as he discovered the error (some time in 1920), but this was denied by the Exchange, and Showalter produced no letter or copy of letter to substantiate his statement.

On December 6, 1920, after he learned of the acceptance of the coal by the Tidewater Exchange, and the extension of the credit to the Fuel Company, Showalter filed suit in the circuit court of Marion county, in the name of the Westwood Exchange, against the Fuel Company and Alexander R. Watson, and caused an attachment to be issued therein, hoping to seize a certain bank deposit in Watson's name which he believed belonged to the Fuel Company. This attachment was fruitless, and no money was seized. Thereafter on January 12, 1921, Showalter caused the intervening petition in this case to be filed in the name of the Coal Company. He explains that there was no inconsistency in bringing suit first in West Virginia in the name of the Westwood ·Exchange against the Fuel Company, and subsequently in Maryland in the name of the Coal Company against the Fuel Company for the same subject-matter, because the Westwood Exchange and the Coal Company were substantially one and the same concern.

In order to support his testimony, he produced the bills of lading of the 42 cars of coal issued by the railroad company at Keyser, W. Va. He secured these bills of lading in January, 1921, two months after the cars had reached Baltimore. The bills of lading show that the coal was consigned to the Tidewater Exchange for the account of the Coal Company. He also produced a sheet from a loose-leaf ledger of the Westwood Exchange, showing that the 40 cars had been sold by the Westwood Exchange to the Coal Company. The coal in fact had been purchased from the mines by the Westwood Exchange; but when the change in the consignment of the 42 cars was made from the Fuel Company to the Coal Company, an account, charging the latter with them, was opened in the Westwood's books. Another sheet from the same ledger showed that 26 cars of coal, which, from his testimony, would appear to represent the prior shipments, were sold by the Westwood Exchange to the Fuel Company. The ledger in question was kept by A. D. Showalter, as bookkeeper. Neither Brock Showalter, who conducted the negotiations for the sale of the coal to the Fuel Company, nor A. D. Showalter, were produced as witnesses.

Such, in substance, was the petitioner's case. Taken by itself, it justifies the conclusion that the 42 cars of coal were not sold to the Fuel Company, but were in fact shipped to Baltimore in the name of the Coal Company, and that the latter never sold the same, or voluntarily parted with possession thereof. This would make out a case for relief. The solution of the matter, however, depends not merely upon the testimony of Howard Showalter and his interpretation of the records of his companies, but also upon the testimony of the officers and employees of the Fuel Company and upon their records. Moreover, a critical examination of the records of the Coal Company, or rather of the Westwood Exchange, does not bear out the conclusions which the petitioner urged upon the court.

On behalf of the libelants the records of the Fuel Company were produced and proved to be consistent in every way with the theory that the 69 cars of coal, including the 42 cars in question, were purchased by the Fuel Company from the Westwood Exchange, and shipped by the Westwood Exchange to the Fuel Company. H. F. Hawkins was in charge of the office of the Fuel Company at Fairmont, W. Va. He testified that the first transaction between the Fuel Company and the Westwood Exchange grew out of a telephone communication from the latter, inquiring if the Fuel Company had a permit for shipment of coal and would purchase coal from the Westwood Exchange. As the result of this conversation 69 cars in all were purchased, and in accordance with the practice the numbers and initials of the cars were furnished to the Fuel Company by the Westwood Exchange. This information was sometimes furnished by telephone and sometimes by notice on postal cards. Office records of the Fuel Company were produced to show memoranda of 51 cars made by the employees of the Fuel Company and 18 additional cars, listed on three postal cards, received from the Westwood Exchange. After the receipt of the notices, it was the practice of the office of the Fuel Company in Fairmont to notify its New York office of the purchase of coal. Three such notices were produced as follows: October 18, 1920, 5 cars; October 28, 10 cars; and October 29, 50 cars. Upon receipt of this information in New York, that office made triplicate confirmations, of which one copy was filed in the New York office, one was sent to the Fairmont office, and one to the seller of the coal. Confirmations were produced from the files of the Fairmont office as follows: November 1, 5 cars; November 1, 10 cars; and November 1, 50 cars. These confirmations were signed by Alexander D. Watson, who had charge of the New York office, and who appeared as a witness and identified the signature. The ledger account of the Fuel Company was produced, and showed the purchase of 69 cars by the Fuel Company from the Westwood Exchange, including all the cars in question.

In the letter of October 29, 1920, from the Fairmont to the New York office of the Fuel Company, reference is made to the fact that the shipper (the Westwood Exchange) would be very glad if the New York office would issue a confirming order for the 50 cars therein mentioned, as well as the previous shipments. Watson testified that he had been out of New York City for some days, and hence the delay. Hawkins testified that he had been requested by the Westwood Exchange to secure the confirming orders.

The books of account of the Westwood Exchange, on the one hand, and the Fuel Company, on the other, are irreconcilable as to the 42 cars in question, and it is impossible to determine which books are correct without reference to other evidence. The testimony of Mr. Showalter, above referred to, and the bills of lading (in the name of the Coal Company), are relied upon strongly by the petitioner as showing the true state of the case. There are, however, certain considerations which rob this testimony and these records of the force to which on their face they would be entitled:

First. It will be recalled that Showalter testified that he made the change in the destination of the 42 cars because of the failure of the

Fuel Company to pay for cars previously shipped in accordance with its agreement. The car records of the Westwood Exchange consist of a list of cars entered according to the date of shipment, giving the car numbers and initials, the consignee and destination, and the person to whom sold. These are the records upon which Showalter made the pencil notations indicating that the consignee had been changed as to the 42 cars from Tidewater Exchange, for the account of the Fuel Company, to Tidewater Exchange, for the account of the Coal Company. The car records not only give the car numbers and initials, but each entry is numbered consecutively. The entries as to the 69 cars, which were first entered by Brock Showalter as sold to the Fuel Company, are found between entry 16 and entry 117, there being one entry for each car. They may be summarized as follows:

October 18.  Entries  16 to  20................................................ 5 cars
         22.          21 to  22................................................ 2
         28.          32 to  41................................................10
         29.          57 to  94................................................38
         29.          96 to 102................................................ 7
         30.         103 to 106................................................ 4
         30.         115 to 117................................................ 3

    Total  ...................................................................69 cars

Of these cars, 2 were confiscated by the Railroad Company, and did not reach the Fuel Company, and 1 seems to be unaccounted for. The remaining 66 are divided by the Coal Company in its contention into two classes: Twenty-six cars, admittedly sold and shipped to the Fuel Company; and 40 cars, originally intended to be shipped to the Fuel Company, but which were reconsigned before they left the mines. The 3 cars which did not reach Baltimore are classified with the 40 cars.

From the testimony of Showalter, one would gather that the prior cars shipped, but not paid for, were the 26 above mentioned, and that the 40 cars reconsigned were of a subsequent date. As a matter of fact, taking the cars in the order in which they appear on the car record of Showalter's concern, the Westwood Exchange, after the changes were made, it is found that the 66 cars are distributed as follows:

| Date. | No. of Entry. | No. of Cars. | Consigned to. |
| --- | --- | --- | --- |
| October 18. | 16 to 20 | 5 cars | Fuel Company |
| 22. | 21 to 22 | 2 cars | Fuel Company |
| 28 | 32 to 41 | 10 cars | Coal Company |
| 29. | 57 to 82 | 26 cars | Coal Company |
| 29. | 83 to 89 | 7 cars | Fuel Company |
| 30. | 90 to 94 and 96 | 6 cars | Coal Company |
| 30. | 97 to 106 | 10 cars | Fuel Company |
| 30. | 115 to 117 | 2 cars | Fuel Company |
| 30. | 116 | 1 car | Coal Company |

An examination of these dates and car shipments shows very clearly that Showalter could not have altered the car records on or about October 28, 1920, in order to prevent the Fuel Company from getting coal before it was paid for, because, if that were his motive, he would have altered the records of all of the cars shipped on and subsequent to

October 28th. The above figures show that, after that date, he permitted 19 cars to go forward to the Fuel Company without requiring prior payment, in precisely the same manner that the 7 cars had been shipped on October 18th and October 22d. He offers no explanation as to why he changed the consignment of 40 cars, and at the same time permitted 19 additional cars to be shipped to the Fuel Company, either on the same day or on days subsequent to the shipment dates of the 40 cars. This is strong evidence that Showalter's recollection in this respect is faulty and that the charges on the car record of the Westwood Exchange must have been made on some other date, and for some other reason.

Second. Showalter testified that he had no contract for the sale of the 40 cars, and was not obligated to ship them; that when he discovered that his nephew had directed the shipment of the same to the Fuel Company, he notified the coal mines to change the consignee to the Coal Company, and then immediately altered the car records of the Westwood Exchange; that a few days thereafter, and before the 40 cars had arrived in Baltimore, he went to New York and demanded payment for prior shipments and also for the 40 cars, but failed to see any officer of the company, and left the city with the impression that he had been evaded. At that time he knew that the cars were on the way to Baltimore, consigned to the Tidewater Exchange for the account of the Coal Company, and he expected the cars to be rejected by the Tidewater Exchange, because his company was not a member thereof, and upon said rejection he expected to take a gambler's chance of selling the cars in Baltimore. Yet he made no effort, after his futile New York trip, to dispose of the cars in Baltimore. His indifference is not explained. So far as he knew, the cars having arrived in Baltimore in the early part of November, and having been rejected by the Tidewater Exchange, were on demurrage in Baltimore. His first step to protect his interest was the West Virginia suit, filed December 6, 1920, which proceeded on the theory, not that the cars had been rejected, but had been sold and delivered to the Fuel Company.

Third. Showalter, upon learning shortly after his New York trip that the affairs of the Fuel Company were in bad condition, joined in a meeting of the creditors of the Fuel Company looking to the acceptance of some security for the debts. He claims that he did not assent to the arrangement that was made, but admits that a lawyer signed for him, without authority, a receipt for certain stock in another corporation which was allotted the Coal Company. He had received certain information to the effect that the Fuel Company had on hand in a West Virginia bank, in the name of its general manager, Alexander R. Watson, the sum of $15,000. He proceeded to Marion county, W. Va., employed a lawyer, and sued out an attachment, hoping to be able to seize the funds in bank. In his affidavit he laid claim for 69 cars of coal sold and delivered by the Westwood Exchange to the Fuel Company, and gave credit for the stock allotted to him at the creditors' meeting. The attachment was fruitless as there proved to be no money in bank. When this attachment suit was filed in West Virginia, Showalter knew that the Baltimore & Ohio Railroad had delivered the 40 cars to the Tidewater Coal Exchange, and that the Exchange had cred-

ited the cars to the Fuel Company. He made no effort then to present a claim against the railroad company or the Exchange. Such an action, supported by his personal affidavit, was entirely inconsistent with his claim that, of the 69 cars, 40 had not been sold to the Fuel Company.

Fourth. Strong reliance is placed by Showalter upon the fact that, after he made the discovery of the so-called erroneous delivery to the Fuel Company, he applied to the Baltimore & Ohio Railroad at Keyser, W. Va., and obtained bills of lading showing that 40 of the cars had actually been consigned to the Tidewater for the account of the Coal Company. Showalter's claim is that the bills of lading showed that the cars were shipped for the account of the Fuel Company, because in fact the cars were so shipped. The records of the Westwood Exchange, however, and the other circumstances of the case tend to show that the bills of lading for the 40 cars were so issued rather as the result of chance, or of mistake, than of design on the part of Showalter or any one connected with the Westwood Exchange.

It is not surprising that names so similar as the Diamond Coal Company and the Diamond Fuel Company were confused by the several persons who had to deal with them and recorded them during the course of a shipment. The likelihood of such confusion is increased by the location in the same town of offices of both companies, which made shipments over the same railroad from West Virginia to the Tidewater Exchange and other parties in Baltimore.

The manner of dealing with any particular car was substantially as follows: The Fuel Company ordered the car from the Westwood Exchange; the Exchange in turn ordered the car from the mines and, having secured the car number, reported it by telephone or in writing to the Fuel Company. The Westwood Exchange made an entry of the car in its car record giving the number and initials of the cars and the consignee, as the Tidewater Exchange for the account of the Fuel Company. Some clerk at the mines prepared a car card containing the number and initials and consignee of the car, which was delivered to the conductor of the train, who in turn delivered it to a railroad official at Keyser, where the car was weighed. When requested, a bill of lading was issued by the railroad at Keyser.

It therefore appears that entries of the consignee were made by the clerk of the Westwood Exchange on its records, by the clerk who prepared the car card at the mine, and by the clerk who had charge of the records of the railroad at Keyser. Any one of these persons might readily have written "Diamond Coal Company" in place of "Diamond Fuel Company." An examination of the car record of the Westwood Exchange indicates that Brock Showalter, who personally sold the cars to the Fuel Company, made the first mistake. It appears in the testimony of Howard Showalter that, when the car record was made by Brock Showalter, it was the latter's intention to ship all of the cars to the Tidewater Exchange for the account of the Fuel Company. He made the entries in ink, which, on the first page, show as consignee the Tidewater Exchange for the account of the *Fuel* Company, for all of the cars in entries 16 to 22 and 32 to 41. But in the entries from 57 to 94, which appear on the second page of the car record, Brock Showalter

wrote: "Tidewater Exchange, account of the Diamond *Coal* Company." On the third page containing entries 97 to 106 and 115 to 117, he wrote: "Tidewater Exchange, account of the Diamond *Fuel* Company." The entries 57 to 94 for the account of the *Coal* Company on the second page, above referred to, were manifestly a mistake on his part, since it is conceded that, when he made the entries, he intended to sell and ship all the cars to the Fuel Company. It was this mistake, it is fair to assume, which suggested the claim set up by Howard Showalter in this case.

Another mistake seems to have been made either by the clerk at the mines or the clerk at Keyser, who issued the bills of lading. At any rate, the clerk at Keyser, W. Va., did not issue bills of lading for all the cars governed by said entries 57 to 94 in the name of the Coal Company. On the contrary, the bills of lading for cars 83 to 89 were in the name of the Fuel Company. If any one compared the bills of lading as issued with entries 57 to 94, he would be struck with this fact as to the entries 83 to 89. Accordingly, we find a pencil memorandum in Howard Showalter's writing on the Westwood Exchange books, opposite entries 83 to 89, as follows: "Error in shipment; should have been Diamond Coal Company."

Nevertheless he makes no claim for these 7 cars, evidently concluding that it was safer to confine himself to cars for which bills of lading showed shipment for the account of the Fuel Company. He found 43 of such bills of lading. Thirty-one bills of lading corresponded with the original erroneous entries made by Brock Showalter on page 2 of the car record, but 7 bills of lading did not correspond with these entries. In addition 12 bills of lading, issued for the account of the Coal Company, did not tally with the entries correctly made by Brock Showalter on pages 1 and 3 of the car record. These facts demonstrate that the bills of lading cannot be relied upon to show with accuracy for whose account the coal was shipped or intended to be shipped.

It is difficult to escape the conclusion that the changes in pencil on the car record of the Westwood Exchange were made by Howard Showalter after the discovery of the mistake made by Brock Showalter on page 2 thereof, and after the bills of lading had been obtained from the railroad. The case of the petitioner rests almost entirely upon the probative effect of the car record and bills of lading, which are, to say the least, conflicting and unconvincing. No effort was made by the petitioner to support the testimony of Howard Showalter, by the clerks of his company, or by employees of the mines who would know whether a reconsignment at the mines had taken place.

Since the evidence tends strongly to show that a sale and delivery by the Westwood Exchange to the *Fuel* Company was intended, and that the cars of coal were actually shipped, it follows that the petitioner has not met the burden of proof resting upon it to show that the property in the coal and the resulting credits remained in the Coal Company.

The decree is affirmed.